# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF NORTH CAROLINA
# CHARLOTTE DIVISION
# CIVIL ACTION NO. 3:19-CV-00631-KDB-DCK

| | |
|---|---|
| THE PARADIES SHOPS, LLC, | |
| **Plaintiffs,** | |
| v. | **ORDER** |
| BROOKSTONE CHARLOTTE, LLC, | |
| **Defendants.** | |

This matter is before the Court on Defendant Brookstone Charlotte, LLC's ("Brookstone") and Intervenor Hudson Group Retail, LLC's ("Hudson") (together, "Defendants") motions for a temporary restraining order ("TRO"). (Doc. Nos. 6, 26). The Court has carefully reviewed the motions and considered the parties' briefs and exhibits and their arguments during the hearing on these motions held on November 25, 2019. For the reasons discussed below, the Court will enter a limited **Temporary Restraining Order** on the terms and with the security described below, which in effect **GRANTS** in part and **DENIES** in part Hudson and Brookstone's motions.

Although the Court finds that Defendants have not yet established a likelihood of success on the merits of their allegation that Brookstone is permitted to enter into the Management Services Agreement between them without obtaining the consent of Plaintiff The Paradies Shops, LLC ("Paradies"), Defendants have shown that they are entitled to a TRO until December 8, 2019, which is the end of the 45-day cure period under the governing contract. However, the entry of the TRO is conditioned on Hudson's execution of an indemnification in favor of Paradies in the standard form used by Paradies with their other sub-concessionaires in the Charlotte Douglas International Airport (the "Airport") and Hudson's posting of a bond or otherwise providing

1

security in the amount of $10,000. Further, this Court will schedule a hearing on December 9, 2019 to consider the parties' requests for a Preliminary Injunction related to whether Hudson may continue to operate the Brookstone store in the Airport without Paradies' consent.

## I.     LEGAL STANDARD

The standard for granting either a TRO or a preliminary injunction is the same and is well established. *See Georgia Vocational Rehab. Agency Bus. Enter. Program v. United States*, 354 F. Supp. 3d 690, 693 (E.D. Va. 2018); *see also Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342, 345 (4th Cir. 2009) ("Because a preliminary injunction affords, on a temporary basis, the relief that can be granted permanently after trial, the party seeking the preliminary injunction must demonstrate by 'a clear showing' that, among other things, it is likely to succeed on the merits at trial."). Every order granting an injunction and every restraining order must: (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. Pro. 65(d)(1).

A TRO or preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief" and may never be awarded "as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22, 24, 32 (2008) (noting that even issuance of a permanent injunction after trial "is a matter of equitable discretion; it does not follow from success on the merits as a matter of right."). The Fourth Circuit has similarly recognized that the grant of such a remedy involves "the exercise of a very far-reaching power, which is to be applied only in [the] limited circumstances which clearly demand it." *Centro Tepeyac v. Montgomery Cnty.*, 722 F.3d 184, 188 (4th Cir.2013) (en banc).

In order to receive an injunction prior to a final decision on the merits, a plaintiff must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm without the preliminary injunction; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *Winter*, 555 U.S. at 20; *Mountain Valley Pipeline, LLC v. Western Pocahontas Properties Limited Partnership*, 918 F.3d 353 (4th Cir. 2019); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014). Each of these four requirements must be satisfied. *Id.* However, movants "need not show a certainty of success." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir.2013).

## II. FACTS AND PROCEDURAL HISTORY

In 2010, the City of Charlotte granted Paradies the right to operate all merchandise concessions in the passenger terminal building at the Airport. On February 9, 2011, Paradies and Brookstone entered into a Merchandise Subconcession Agreement, which allowed Brookstone to sublet commercial space from Paradies to operate a merchandise subconcession at the Airport. In 2018, the parties entered into the Charlotte Douglas International Airport Second Amended and Restated Merchandise Subconcession Agreement (Space 27 (Kiosk)) (the "Subconcession Agreement"), which is the governing contract at issue in this dispute.

Article IX of the Subconcession Agreement is titled "ASSIGNMENT, TRANSFER AND SUBLEASING" and states:

> Subconcessionaire shall neither assign nor transfer this Agreement or any right or interest to it by this Agreement without the prior written consent of Concessionaire and City. Subconcessionaire shall not sub-assign the Assigned Premises or any portion thereof, nor shall Subconcessionaire sub-assign any privileges granted with respect to the operation of a Merchandise Subconcession on said Assigned Premises or any portion thereof, without the prior written consent of Concessionaire and City. A direct or indirect transfer of equity constituting a change of control of management of Subconcessionaire shall constitute a prohibited assignment for purposes of this Article IX. No assignment, transfer or

3

sub-assignment shall serve to release Subconcessionaire from any of its obligations, duties or responsibilities under this Agreement unless Concessionaire and City agree thereto in writing. Any assignment, transfer or sub-assignment shall be in writing, and the form of which shall be furnished to Concessionaire for approval prior to any execution thereof.

Thus, Brookston and Paradies agreed that Paradies would have a broad continuing right to determine who became a subconcessionaire or held any "right or interest" under the Subconcession Agreement or "any privileges granted with respect to the operation of a Merchandise Subconcession." The "rights" and "privileges" granted to Brookstone by the Subconcession Agreement include, without limitation, the "[r]ight to operate all merchandise concessions," and the "right, privilege and obligation to occupy, equip, furnish, operate, and maintain the Merchandise Subconcession in each Store comprising the Assigned Premises."

Further, the Subconcession Agreement granted Paradies the right to terminate the agreement upon an "event of default," which includes "[t]he failure in any material respect of Subconcessionaire to perform, fully and promptly, any act required of it under the terms of this Agreement, or otherwise to comply with any term or provision hereof…." However, in Article X(d), the Subconcession Agreement gives Brookstone a 45-day period to "cure" any alleged violation of the agreement that Paradies claims to be an event of default.

Brookstone Stores, Inc, ("Brookstone Stores"), then a member of Brookstone, filed for Chapter 11 bankruptcy in or around August 2018. In March 2019, a Federal Bankruptcy Court judge approved a reorganization plan that required Brookstone Stores to sell its airport stores to a partnership that included electronics manufacturer Apex Digital, Inc. ("Apex")[1] and Apex

---

[1] The Bankruptcy Judge's application of the bankruptcy code superseded the Subconcession Agreement's anti-assignment clause and entitled Apex to assume Brookstone Stores' membership interest in Brookstone.

began operating Brookstone's Airport concession. However, Apex's operation of the Brookstone store in the Airport has not been successful.

On October 8, 2019, Hudson entered into a series of transactions with Apex and the company that owns the Brookstone trademarks (Bluestar) to operate the Brookstone Charlotte and other Brookstone airport stores. Hudson, like Paradies, operates various retail stores, cafes, specialty retailers, and duty-free shops in airports throughout the United States and is one of Paradies' largest competitors. Hudson and Apex entered into an Asset Purchase Agreement whereby Hudson would acquire Apex's interest in the Brookstone airport stores (or in the joint ventures operating in certain stores) subject to Apex obtaining any requisite consents to assign or transfer such interests to Hudson. Hudson and Apex also entered into a management services agreement ("MSA") to provide Brookstone with management and other services for the Charlotte airport store.

Apex gave notice of its agreements with Hudson to Paradies beginning on October 9, 2019 and since that time has sought Paradies consent to Hudson's involvement. However, Paradies has, through the course of a number of letters and other communications, refused to consent to the transfer or assignment of any ownership interest to Hudson or Hudson taking over management of the Brookstone store at the Airport. Ultimately, on October 24, 2019, Paradies terminated the Subconcession Agreement by letter on the grounds that Brookstone assigned rights and privileges to Hudson without Paradies' prior written consent in violation of Article IX.

Also on October 24, 2019, Paradies filed an action in the Superior Court of Mecklenburg County North Carolina seeking declaratory and preliminary injunctive relief holding that (1) Brookstone has committed an Event of Default, (2) Brookstone has failed to timely cure the Event of Default or that any attempted cure would be futile, (3) Paradies properly terminated the

Subconcession Agreement, and (4) Brookstone must immediately vacate the premises. Brookstone removed that lawsuit to this Court on November 20, 2019, and on the same day Hudson filed its Motion to Intervene,[2] Intervenor Complaint and Motion for Temporary Restraining Order. On November 22, 2019, Brookstone filed its Answer, denying the material allegations of Paradies' Complaint and also seeking a preliminary injunction requiring that Paradies allow Hudson to operate the Brookstone store in the Airport. Brookstone also joined Hudson's TRO motion on the same day. (Doc. Nos. 26-27).

### III.   DISCUSSION

In their TRO motion, Defendants ask the Court to grant a temporary restraining order requiring Paradies to refrain from:

1. Preventing employees of Brookstone Charlotte, LLC ("Brookstone") from receiving security badges or otherwise impeding Hudson or Brookstone Charlotte employees from accessing the Brookstone Charlotte store;

2. Refusing to approve products to be sold at the Brookstone Charlotte store or otherwise failing to support the Brookstone Charlotte store;

3. Preventing Hudson from performing services under the MSA; and

4. Terminating Paradies' agreement with Brookstone.

---

[2] Hudson's Motion to Intervene was granted on November 22, 2019 (Doc. No. 16) and Paradies moved the Court to reconsider that Order later on the same day (Doc. No. 29) (but filed no brief or memorandum in support of its motion). Rule 24(b) of the Federal Rules of Civil Procedure provides that "[o]n timely motion, the court may permit anyone to intervene who ... has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b). Whether to allow permissive intervention is within the sound discretion of the district court. *Smith v. Pennington*, 352 F.3d 884, 892 (4th Cir. 2003). The Court finds, only for the purpose of deciding these TRO motions, that Hudson may permissibly intervene pursuant to Federal Rule of Civil Procedure 24(b).  Also, at the hearing on these motions, Paradies consented to Hudson's intervention with respect to its TRO motion so long as it was given the opportunity to respond to Hudson's Motion to Intervene, which the Court allowed.

In support of those requests, Defendants primarily argue that the transactions between Apex, Brookstone and Hudson do not violate the anti-assignment clause in the Subconcession Agreement so Paradies has no right to terminate that agreement or otherwise refuse to cooperate with Hudson's operation of the Brookstone store at the airport. More specifically, they argue that "because there is no assignment of any equity or ownership interest in Brookstone Charlotte unless and until the requisite consents have been obtained, there has been no breach of any consent to assign clause under the Subconcessionaire Agreement."

Again, to obtain a TRO Defendants must establish that: (1) they are likely to succeed on the merits; (2) are likely to suffer irreparable harm without the preliminary injunction; (3) the balance of equities tips in their favor; and (4) the injunction is in the public interest.

### A. Likelihood of Success

To establish a likelihood of success to support the temporary relief they have requested, Defendants must show that Paradies does not have the right to refuse to consent to Hudson operating the Brookstone store in the Airport *or* that the cure period mandated by the Subconcessionaire Agreement prohibits Paradies from taking the actions complained of prior to the end of the cure period. The Court finds that Defendants have not shown a likelihood of success on the contractual consent issue but does find that they have a likelihood of success on whether the cure period has expired.

The validity and enforcement of assignment clauses in contracts are governed by the general principles of contract law. S*ee Gillespie v. DeWitt,* 53 N.C. App. 252, 262, *disc. review denied,* 304 N.C. 390 (1981). On the core question presented, North Carolina contract law is clear. Provisions in bilateral contracts that forbid or restrict assignment of the contract without the consent of the obligor are generally valid and enforceable. *See Parkersmith Properties v.*

7

*Johnson*, 136 N.C. App. 626, 631 (2000). Indeed, in *Parkersmith*, the court directly addressed and rejected Defendants' suggestion that a contractual party may not withhold consent to an assignment unless it is reasonable to do so, holding "[w]e find no authority in North Carolina for Plaintiff's argument that a party may not withhold its consent to an assignment under a valid non-assignment clause unless the party's withholding of consent is reasonable." Accordingly, Paradies may withhold its consent in its discretion to any assignment or transfer of interests for which consent is required under the Subconcession Agreement.

Therefore, the critical issue becomes whether Defendants have established a *likelihood* of success that their transaction is outside the bounds of the broad anti-assignment clause quoted above. The Court finds that Defendants have failed to meet that burden. Article IX of the Subconcession Agreement prohibits, *inter alia*, the assignment or transfer of "any right or interest granted to [Brookstone] by" the Subconcession Agreement or "sub-assign[ing] any privileges granted with respect to the operation of a Merchandise Subconcession." The "rights" and "privileges" granted to Brookstone by the Subconcession Agreement include, without limitation, the "[r]ight to operate all merchandise concessions" and the "right, privilege and obligation to occupy, equip, furnish, operate, and maintain the Merchandise Subconcession comprising in each Store comprising the Assigned Premises" (§ 2.03(a)).

In the MSA, Brookstone (through Apex) appears to have assigned or transferred *all* its rights and privileges with respect to the Subconcession Agreement (other than perhaps its right to sell those rights to a third party) to Hudson. Hudson's duties are for all practical purposes the same as the tasks formerly performed by Brookstone. Therefore, even in the absence of a final transfer of Brookstone's / Apex's equity interest, Hudson appears to have taken on all the responsibilities of the subconcessionaire as if the transfer of equity did take place. And, in any

event, it appears to the Court that Brookstone / Apex has "sub-assign[ed] [at least one] privilege[] granted with respect to the operation of a Merchandise Subconcession."

In sum, the Court rejects Defendants' argument that absent a transfer or assignment of equity or ownership interests, a subconcessionaire can freely transfer any or all its operating rights under the Subconcession Agreement without Paradies consent. Not only is Defendants' argument belied by the specific language of the anti-assignment clause, it would be an absurd result to give Paradies consent rights over the entity who *owns* the interests, but none at all over the entity that actually *operates* the store, i.e., the entity that it will have to work with at the Airport. In other words, the Court finds with respect to the TRO motions that it would be an unreasonable reading of the provision to give Paradies the right to consent *only* with respect to the final legal transfer or assignment of the subconcessionaire's ownership interests.

Defendants do, however, have a likelihood of success on the issue of the cure period. The contract clearly provides for a 45-day cure period for alleged violations of the agreement. While Paradies, Brookstone, Apex and Hudson exchanged numerous letters earlier in October, at least by October 24, 2019 Paradies made its position final and purportedly terminated the Subconcession Agreement, without any period for Brookstone to cure the alleged violation. A 45-day cure period beginning on October 24, 2019 runs until December 8, 2019. Thus, so long as the other elements of a TRO are present (as discussed below) Defendants are entitled to a cure period until December 8, 2019 to remedy the failure to obtain consent to the MSA or make other arrangements to operate the store.[3]

---

[3] Paradies argues that the cure period is "futile" or otherwise not applicable here. The Court disagrees. Indeed, Paradies notes in its brief how Brookstone could potentially cure the contractual violation by making other plans to run the store without Hudson (in the absence of consent which they say is not forthcoming).

### B. Irreparable Harm

With respect to the second prong of the TRO standard, the Court finds that Defendants are likely to suffer irreparable harm without the TRO until the end of the cure period. Brookstone alleges that it currently has only four employees (three full time and one part time) working at the kiosk and that Paradies is blocking Defendants[4] from hiring additional employees by refusing to allow them to apply for Airport security badges. Defendants claim that if Defendants are not permitted to hire these additional employees[5] then it is likely that the business will have to be closed because of the strain on the few remaining employees, some of whom are threatening to quit if circumstances don't improve. While Paradies questions Defendants' nearly one-month delay in seeking the TRO after the October 24 termination of the Subconcession Agreement and alleges that Defendants have manufactured the alleged emergency, the imminent closure of a business, whatever the facts are related to its timing and provenance, is plainly an irreparable harm. Accordingly, the Court finds that Defendants have sufficiently established that they will likely suffer irreparable harm unless a TRO is issued for the remainder of the cure period.

### C. Balance of Equities

As with irreparable harm, Defendants have also shown that the balance of equities tips in their favor for an injunction until the end of the cure period on December 8, 2019. In the absence of a TRO, Defendants may, as discussed above, be required to close the business which may

---

[4] At oral argument, the Court asked the Defendants which entity employed the workers at the kiosk, but counsel could not answer the question.

[5] In hiring new employees, Defendants should provide notice to the employees of the pendency of this dispute and the possibility that their employment may not last beyond December 9, 2019.

adversely affect the business' employees, the Airport and the travelling public. Paradies in turn argues that it will be harmed by the risks attendant to its involvement in providing security badges for additional employees and having to work with a competitor thereby exposing confidential information. For the short time period of the TRO being considered, the balance of these equities favors Defendants. Further, Paradies' concerns related to security badges and the disclosure of confidential information can be mitigated by the terms of the TRO as ordered below.

### D. Public Interest

Finally, the Court finds that a limited TRO on the terms to be entered by the Court is in the public interest. It is in the "public interest . . . to enforce valid contracts." *NaturaLawn of Am., Inc. v. W. Grp., LLC*, 484 F. Supp. 2d 392, 404 (D. Md. 2007); *accord Maaco Franchising, LLC v. Boensch*, No. 3:16-CV-155-GCM, 2016 WL 4746215, at *11 (W.D.N.C. Sept. 12, 2016). More specifically, there is a public interest in giving parties who bargained for a "cure period" to remedy alleged contractual breaches the full agreed period to do so, potentially avoiding litigation over the breach. In addition, there is a public interest in "preserving the status quo" for a short period of time pending further adjudication of the case or the parties' resolution of their dispute. *See Di Base v. SPX Corp.*, 872 F.3d 224, 228 (4th Cir. 2017). Therefore, the Court finds that the public interest will be served by entry of a limited TRO in this action.

### E. Security for the TRO

Rule 65(c) provides that an injunction may issue only if the movant "gives security in an amount the Court considers proper …." The Court therefore orders that Hudson post a bond

with the Clerk of this Court[6] in the amount of $10,000 as security for the TRO. Also, because of the risk to Paradies as a consequence of requiring Paradies to participate in providing security badges to new employees hired to work in the business and otherwise working with Hudson, the Court will order Hudson to execute an indemnification in the standard form that Paradies requires for other subconcessionaires at the Airport. Further, Hudson is directed to work with Paradies to reasonably "shield" from Hudson any confidential or proprietary information with respect to Paradies or Paradies' working relationship with its subconcessionaires, which Hudson committed that it would do at oral argument.

**THEREFORE, IT IS HEREBY ORDERED THAT** The Paradies Shops, LLC, and anyone acting in concert with it or on its behalf, is hereby immediately restrained and enjoined from:

1. Handling requests from Hudson or Brookstone to process security badges for new employees for the Brookstone kiosk at the Airport other than in the good faith and **prompt** application of the normal security badge approval process that Paradies uses for other subconcessionaires at the Airport;

2. Refusing to approve products to be sold at the Brookstone kiosk or otherwise failing to cooperate with the Brookstone business in good faith in the same manner as it works with other subconcessionaires at the Airport; and

3. Preventing Hudson from performing services under the MSA by which Hudson provides services to Brookstone for the Brookstone kiosk at the Airport except on the same terms as it would act in good faith with respect to other subconcessionaires at the Airport.

---

[6] In the alternative, Hudson may provide the security to Paradies' counsel to be held in trust until further order of the Court.

**IT IS FURTHER ORDERED THAT** Hudson post or otherwise provide security as permitted by this Order in the principal amount of ten thousand U.S. dollars ($10,000.00) for the payment of such costs and damages as may be incurred or suffered by Paradies if it is later found that Paradies was wrongfully enjoined or restrained by this Order. Also, Hudson is ordered to execute an indemnification in favor of Paradies in the standard form that Paradies requires for other subconcessionaires at the Airport and to work with Paradies to reasonably "shield" from Hudson any confidential or proprietary information with respect to Paradies or Paradies' working relationship with its subconcessionaires.

Unless otherwise extended by agreement of the parties or by Order of this Court, this Order will expire at 9:30 a.m. on December 9, 2019.

**IT IS FURTHER ORDERED THAT** a hearing will be held at the Charles R. Jonas Federal Building in Charlotte, North Carolina on all of the parties' and intervenor's requests for a Preliminary Injunction on December 9, 2019, at 9:30 a.m. EST.

Signed: November 26, 2019

Kenneth D. Bell
United States District Judge